## ORAL ARGUMENT NOT YET SCHEDULED

**Case Nos. 22-1278 and 22-1280 (consolidated)**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**ANTERO RESOURCES CORPORATION, ET AL.,**
**Petitioners,**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION,**
**Respondent.**

## ON PETITIONS FOR REVIEW OF ORDERS OF THE
## FEDERAL ENERGY REGULATORY COMMISSION

**FINAL BRIEF OF ENVIRONMENTAL DEFENSE FUND
AS AMICUS CURIAE IN SUPPORT OF
PETITIONERS ANTERO RESOURCES CORPORATION, MU
MARKETING LLC, AND EQT ENERGY LLC IN SUPPORT OF
REVERSAL OF THE CHALLENGED ORDERS**

Dan Grossman
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO  80302
(303) 447-7213
dgrossman@edf.org

Natalie M. Karas
Jason T. Gray
Duncan & Allen LLP
1730 Rhode Island Avenue NW
Suite 700
Washington, DC  20036
(202) 289-8400
nmk@duncanallen.com
jtg@duncanallen.com

*Additional Counsel on Following Page*

Ted Kelly
Environmental Defense Fund
1875 Connecticut Ave, NW
Washington, DC  20009
(202) 572-3389
teklley@edf.org

*Attorneys for the Environmental Defense Fund*

Final Dated: August 14, 2023

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

### A.      Certificate as to Parties and Amici

Per Circuit Rule 28(a)(1)(A), the Environmental Defense Fund submits that all parties and intervenors appearing in this court and in the proceeding before the Federal Energy Regulatory Commission are listed in the Initial Briefs filed by Antero Resources Corporation, MU Marketing LLC, and EQT Energy LLC. Environmental Defense Fund is participating in this proceeding as an *amicus curiae*.

### B.      Certificate as to Rulings under Review

Per Circuit Rule 28(a)(1)(B), the rulings under review are the following orders of the Federal Energy Regulatory Commission:

- *Tennessee Gas Pipeline Co., L.L.C.*, Order Accepting Tariff Records, 179 FERC ¶ 61,233 (June 30, 2022);

- *Tennessee Gas Pipeline Co., L.L.C.*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 180 FERC ¶ 62,104 (September 1, 2022); and

- *Tennessee Gas Pipeline Co., L.L.C.*, Order Addressing Arguments Raised on Rehearing, 181 FERC ¶ 61,063 (October 25, 2022).

### C.      Certificate as to Related Cases

Undersigned counsel are not aware of any related cases as defined by Circuit Rule 28(a)(1)(C).

Respectfully submitted,

Dan Grossman
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO  80302
(303) 447-7213
dgrossman@edf.org

/s/ Natalie M. Karas
Natalie M. Karas
Jason T. Gray
Duncan & Allen LLP
1730 Rhode Island Avenue, NW
Suite 700
Washington, DC  20036
(202) 289-8400
nmk@duncanallen.com
jtg@duncanallen.com

Ted Kelly
Environmental Defense Fund
1875 Connecticut Ave, NW
Washington, DC  20009
(202) 572-3389
teklley@edf.org

*Attorneys for the Environmental Defense Fund*

Final Dated: August 14, 2023

## <u>RULE 26.1 CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of the Circuit Rules for the United States Court of Appeals for the District of Columbia Circuit, the Environmental Defense Fund is a non-profit organization and therefore does not issue stock to the public.

Respectfully submitted,

*/s/ Natalie M. Karas*

Dan Grossman
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO  80302
(303) 447-7213
dgrossman@edf.org

Natalie M. Karas
Jason T. Gray
Duncan & Allen LLP
1730 Rhode Island Avenue, NW Suite 700
Washington, DC  20036
(202) 289-8400
nmk@duncanallen.com
jtg@duncanallen.com

Ted Kelly
Environmental Defense Fund
1875 Connecticut Ave, NW
Washington, DC  20009
(202) 572-3389
tekelley@edf.org

*Attorneys for the Environmental Defense Fund*

Final Dated: August 14, 2023

# TABLE OF CONTENTS

**CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES** ................................................................. iii

**RULE 26.1 CORPORATE DISCLOSURE STATEMENT** ............................. v

**RULE 29(A)(4)(E) STATEMENTS** ................................................ vii

**TABLE OF AUTHORITIES** ..................................................... viii

**GLOSSARY OF ABBREVIATED TERMS AND TERMS OF ART** ............. xi

**STATUTES AND REGULATIONS** ..................................................1

**STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE** ..........................................................1

**SUMMARY OF ARGUMENT** .......................................................2

**ARGUMENT** ..........................................................................5

**A.    FERC Acted Contrary to Law in Finding that the Certified Gas Criteria Do Not Affect Jurisdictional Service and Therefore Need Not be Included in Tennessee Gas' Tariff** ..........................................5

**B.    FERC's Orders Attach a Presumption of Validity to the Certified Gas Criteria that Govern Tennessee Gas' Certified Gas Pooling Service** .......7

**C.    FERC's Orders Afford Tennessee Gas Undue Discretion in Contravention of the Natural Gas Act** .....................................10

**D.    FERC's Orders Contravene the Natural Gas Act's Consumer-Protection Aim** .........................................................13

**CONCLUSION** ......................................................................16

**CERTIFICATE OF COMPLIANCE**

**CERTIFICATE OF SERVICE**

**ADDENDUM A**

# RULE 29(A)(4)(E) STATEMENTS

Per Rule 29(a)(4)(E), I certify that: (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (3) no person—other than the Environmental Defense Fund or its counsel—contributed money that was intended to fund the preparing or submitting of this brief.

Respectfully submitted,

/s/ Natalie M. Karas

Dan Grossman
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO 80302
(303) 447-7213
dgrossman@edf.org

Natalie M. Karas
Jason T. Gray
Duncan & Allen LLP
1730 Rhode Island Avenue, NW
Suite 700
Washington, DC 20036
(202) 289-8400
nmk@duncanallen.com
jtg@duncanallen.com

Ted Kelly
Environmental Defense Fund
1875 Connecticut Ave, NW
Washington, DC 20009
(202) 572-3389
tekllley@edf.org

*Attorneys for the Environmental Defense Fund*

Final Dated: August 14, 2023

vii

# TABLE OF AUTHORITIES

## COURT CASES

*Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.*,
   360 U.S. 378 (1959)...............................................................................................13

*City of Cleveland v. FERC,*
   773 F.2d 1368 (D.C. Cir. 1985)……………………………………….......5, 6

*FPC v. Hope Natural Gas Co.*,
   320 U.S. 591 (1944).....................................................................................2, 10

*NAACP v. FPC,*
   425 U.S. 662 (1976)……………………………………………………...15

*Nat. Fuel Gas Supply Corp. v. FERC*,
   468 F.3d 831 (D.C. Cir. 2006)……………………………………………….4

*N. Ind. Pub. Serv. Co. v. FERC*,
   782 F.2d 730 (7th Cir. 1986)…………………………………………………8

*Pub. Serv. Comm'n of N.Y. v. FERC*,
   813 F.2d 448 (D.C. Cir. 1987) …………………………………………..6

*Vill. of Bethany, Ill. v. FERC*,
   76 F.3d 934 (7th Cir. 2002)……………………………………………..…8

## ADMINISTRATIVE DECISIONS

*Nat. Gas Pipeline Co. of Am.*,
   69 FERC ¶ 61,053 (1994)……………………………………………..4, 10

*PJM Interconnection, L.L.C.*,
   175 FERC ¶ 61,084 (2021)…………………………………………..6

*Proceeding on Motion of the Commission as to
the Rates, Charges, Rules and Regulations of
Orange and Rockland Utilities, Inc. for
Gas Service,*
Case 21-G-0073, 2022 N.Y. PUC LEXIS
194 (2022)………………………………………….……...9

*Regulation of Short-Term Natural Gas
Transportation Services, and
Regulation of Interstate Natural Gas
Transportation Services,* Order No. 637,
FERC Stats. & Regs. ¶ 31,091 (2000)…………………………………………15

*Tenn. Gas Pipeline Co., L.L.C.*,
179 FERC ¶ 61,076 (2022)……………………………………………14

## FEDERAL STATUTES

15 U.S.C. § 717c(a)……………………………………...….………2, 4, 5, 7

15 U.S.C. § 717c(c)………………………………………………2, 5

15 U.S.C. § 717c(d)……………………………………….....…2, 5

## OTHER AUTHORITIES

American Gas Association, Green Tariffs &
Differentiated Gas/Certified Lower Methane
Gas Summary and Tracker (Nov. 9, 2021),
https://www.aga.org/wp-content/uploads/2022/12/differentiated-gas-summary-and-tracker-nov-9-2021-update.pdf…………………………………………12

Dan Grossman, *Energy Security and Climate Change
Demand Real Action, Not Shaky Promise of 'Low-emission Gas,'*
Virginia Mercury (March 29, 2022),
https://www.virginiamercury.com/2022/03/29/energy-security-and-climate-demand-real-action-not-shaky-promise-of-low-emission-gas/…………………………12

Dan Grossman, & Maureen Lackner,
Environmental Defense Fund,
*Differentiated Gas: Nothing But Hot Air
without These Five Criteria* (May 19, 2022),
https://blogs.edf.org/energyexchange/2022/05/19/differentiated-gas-nothing-but-hot-air-without-these-five-criteria/…….................................................................9

Department of Energy's Office of Fossil Energy
and Carbon Management's Draft Framework for
Differentiated Natural Gas:  Criteria,
Transparency, and Governance
(March 9, 2023 Discussion Draft)…………………………...…..9, Addendum A

Maureen Lackner & Kristina Mohlin,
Environmental Defense Fund, *Certification of
Natural Gas With Low Methane Emissions:
Criteria for Credible Certification
Programs* (2022),
https://blogs.edf.org/energyexchange/files/2022/05/EDF_Certification_White-Paper.pdf .......................................................................1, 2, 3, 9, 11

Ramón A. Alvarez *et al.*, *Assessment of Methane
Emissions from the U.S. Oil and Gas Supply Chain*,
361 Science 186 (2018),
https://www.science.org/doi/10.1126/science.aar7204…………………...……1

## <u>GLOSSARY OF ABBREVIATED TERMS AND TERMS OF ART</u>

| Term | Description |
|---|---|
| AGA Tracker | American Gas Association, Green Tariffs & Differentiated Gas/Certified Lower Methane Gas Summary and Tracker (Nov. 9, 2021) https://www.aga.org/wp-content/uploads/2022/12/differentiated-gas-summary-and-tracker-nov-9-2021-update.pdf. |
| Certified Gas | Certified Gas refers to natural gas that is purported by operators as having undergone independent third-party certification and that the gas has been produced under specified best practices around methane mitigation and/or other environmental, social and governance attributes. Certified Gas is sometimes referred to as "Differentiated Gas," "Producer Certified Gas," or "Responsibly Sourced Gas." |
| Certified Gas Criteria | The Certified Gas Criteria include: (1) the list of qualified third-party vendors eligible to provide Certified Gas certification; (2) certification metrics; (3) the acceptable certification ratings level; and (4) the acceptable methane emissions intensity level threshold. Tennessee Gas Pipeline Company, L.L.C.'s filing in the proceedings below refers to the criteria as Producer Certified Gas Criteria or PCG Criteria. |
| December 2021 Tariff Filing | Tennessee Gas Pipeline Co., L.L.C. Filing to Implement PCG Pooling Service Option under Rate Schedule SA, Proposed Rate Schedule SA, Docket No. RP22-417-000 (December 15, 2021) |
| DOE Draft Framework | The Department of Energy's Office of Fossil Energy and Carbon Management's Draft Framework for Differentiated Natural Gas: Criteria, Transparency, and Governance (March 9, 2023 Discussion Draft), included as Addendum A |

| Term | Description |
|------|-------------|
| EDF | Amicus Curiae, Environmental Defense Fund |
| EDF White Paper | Maureen Lackner & Kristina Mohlin, Environmental Defense Fund, *Certification of Natural Gas With Low Methane Emissions: Criteria for Credible Certification Programs* (2022), https://blogs.edf.org/energyexchange/files/2022/05/EDF_Certification_White-Paper.pdf. |
| FERC | Respondent, Federal Energy Regulatory Commission |
| JA | Joint Appendix |
| NAESB | North American Energy Standards Board |
| OGMP 2.0 | Oil & Gas Methane Partnership 2.0 |
| p. | Citation to pages in orders of the Federal Energy Regulatory Commission |
| P | Citation to paragraphs in orders of the Federal Energy Regulatory Commission |
| Tennessee Gas | Intervenor, Tennessee Gas Pipeline Company, L.L.C. |

## STATUTES AND REGULATIONS

Applicable statutes are in Petitioners' opening briefs.


## STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE

Amicus Environmental Defense Fund ("EDF") is a membership organization whose mission is to preserve the natural systems on which all life depends. EDF is a leading authority on the use of science, economics, and law to protect and restore the quality of our air and climate, transform energy systems, and ensure healthy and safe communities. EDF's work includes a ground-breaking series of studies quantifying methane emissions from the natural gas supply chain and analyzing emissions data, technologies and policies to reduce natural gas leakage and minimize the climate impacts of natural gas development. *See, e.g.*, Ramón A. Alvarez *et al*., Assessment of Methane Emissions from the U.S. Oil and Gas Supply Chain, 361 Science 186 (2018), https://www.science.org/doi/10.1126/science.aar7204. EDF is also a thought-leader on the issue of, and policy challenges associated with, Certified Gas. *See* EDF White Paper.

EDF's participation here provides helpful context about the significant consequences that will flow from the Federal Energy Regulatory Commission's ("FERC") failure to act pursuant to the Natural Gas Act, allowing a pipeline unfettered discretion to shape the scope and emissions reduction potential of

1

Certified Gas programs while ignoring the resulting impacts to the natural gas market and ultimate consumers.  Pursuant to Circuit Rule 29(b), all parties have consented to EDF's filing.

## SUMMARY OF ARGUMENT

The Natural Gas Act's "primary aim" is "to protect consumers against exploitation at the hands of natural gas companies." *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 610 (1944).  The interrelated provisions of Section 4 of the Natural Gas Act work together to ensure just and reasonable rates charged by FERC-jurisdictional pipelines (15 U.S.C. § 717c(a)), promote transparency of the "classifications, practices, and regulations" associated with those rates (15 U.S.C. § 717c(c)), and prevent pipelines from exercising undue discretion in changing rates and conditions without proper notice.  15 U.S.C. § 717c(d).  FERC's Orders failed to adhere to these core statutory responsibilities.

Enforcing FERC's statutory framework in the proceeding below was critical given Tennessee Gas Pipeline Company L.L.C.'s ("Tennessee Gas") "first-of-its-kind" Certified Gas Pooling Service proposal—expected to unleash an influx of "Certified Gas" transactions on a pipeline that stretches from Texas to Connecticut.  December 2021 Tariff Filing at 2; JA 175.  Transacted via private, bilateral contracts, Certified Gas is purported to have superior environmental attributes but is not subject to any comprehensive regulatory framework or meaningful oversight.  *See* EDF

2

White Paper at 6-7.   Contravening the Natural Gas Act, FERC's Orders authorize "Certified Gas" transactions without requiring Tennessee Gas to include in its tariff any legitimate criteria to support claims of superior emissions performance.

In the challenged Orders, FERC made two internally inconsistent findings. First, FERC accepted the Certified Gas Pooling Service as part of Tennessee Gas' FERC-jurisdictional tariff.  R32, P 15; JA90.  But when ruling on the Certified Gas Criteria that define who is eligible to use that service, FERC found the criteria would not affect jurisdictional service (R32, P 18; JA91-92) and the criteria were of "practical insignificance." R40, P 18, n.50; JA161.  Such contradictory and internally inconsistent findings epitomize unreasoned decisionmaking, as demonstrated by a dissenting Commissioner's description of the majority's conclusion as "legally incorrect." *See* R32, Commissioner Danly's Dissent, P 6; JA98.

Despite these deficiencies, FERC's Orders will attach a presumption of validity to the Certified Gas Criteria that will govern Tennessee Gas' Certified Gas Pooling Service even though FERC never scrutinized whether the criteria will reduce methane emissions as purported.  This is particularly problematic given that the nascent Certified Gas market already lacks both sufficient oversight and consistent standards on which to base meaningful certifications.  EDF White Paper at 7, 8.  If affirmed, FERC's Orders will undoubtedly create confusion and invite

3

unverifiable if not deceptive claims about the emissions attributes of natural gas bought and sold.

FERC's abdication of its responsibilities under the Natural Gas Act leaves Tennessee Gas with undue discretion to revise the Certified Gas Criteria at will. This is inconsistent with FERC's prior precedent where FERC has taken steps to protect against undue discretion granted to pipelines. *See, e.g.*, *Nat. Gas Pipeline Co. of Am.,* 69 FERC ¶ 61,053, p. 61,212 (1994). Placing pipelines as arbiters of what constitutes "Certified Gas" and allowing them to revise the criteria at any time will lead to a suboptimal market devoid of rigor and consistency and will subject consumers to increased costs without any assurance of superior environmental benefits.

By failing to adhere to a statutory framework that requires the filing of "classifications, practices, and regulations" that impact rates, FERC abdicated its primary responsibility of protecting customers. *Nat. Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 833 (D.C. Cir. 2006). FERC turned a blind eye to the consequences that will flow from the filing, including an influx of Certified Gas that FERC acknowledged could trade at a premium. R32, P 20; JA92. End-use customers will pay transportation rates that are affected by the Certified Gas Criteria without any certainty that emissions were in fact reduced, contravening the Natural Gas Act. 15 U.S.C. § 717c(a).

FERC had no lawful basis for accepting Tennessee Gas' Certified Gas Pooling Service as a jurisdictional service, while simultaneously finding that the Certified Gas Criteria do not affect jurisdictional service and therefore need not be filed. Consequently, the Court should vacate the challenged Orders.

## **ARGUMENT**

### A.   **FERC Acted Contrary to Law in Finding that the Certified Gas Criteria Do Not Affect Jurisdictional Service and Therefore Need Not be Included in Tennessee Gas' Tariff**

The Natural Gas Act obligates FERC to ensure that rates and charges for FERC-jurisdictional service are just and reasonable. 15 U.S.C. § 717c(a). It also requires FERC-regulated pipelines to include in publicly filed tariffs all "classifications, practices, and regulations" affecting such rates and charges. 15 U.S.C. § 717c(c). Pipelines must also provide advance notice of any changes to their FERC-approved rates before such changes take effect. 15 U.S.C. § 717c(d).

Classifications and practices must be filed with FERC when they "affect rates and service *significantly*, . . . are realistically *susceptible* of specification, and . . .are not so generally understood in any contractual arrangement as to render recitation superfluous." *City of Cleveland v. FERC,* 773 F.2d 1368, 1376 (D.C. Cir. 1985) (emphasis in original). FERC only addressed the first of these three prongs, finding that the Certified Gas Criteria are of "practical insignificance." R40, P 18, n.50;

JA161.  Its flawed analysis of this first prong, and failure to address the other two

prongs, constitute unreasoned decision-making.

The Certified Gas Criteria are essential classifications affecting the Certified

Gas Pooling Service—they specify which entities qualify as eligible certifiers, the

acceptable ratings level, and methane emissions intensity.   R1, Exhibit 1; JA5.

Tennessee Gas must weigh and assess the criteria every time it determines which

entities qualify to use the Certified Gas Pooling Service.  *Cf. Pub. Serv. Comm'n of*

*N.Y. v. FERC*, 813 F.2d 448, 454 (D.C. Cir. 1987) (finding a policy that was "highly

unlikely to occur" need not be included in the tariff).  Indeed, without the Certified

Gas Criteria, the Certified Gas Pooling Service could not exist, since nothing would

distinguish it from Tennessee Gas' existing paper pooling service.

Though FERC did not squarely address this prong, the record supports a

finding that the Certified Gas Criteria are "realistically susceptible of specification."

*City of Cleveland,* 773 F.2d at 1376.  The Certified Gas Criteria are identifiable

and/or quantifiable classifications and therefore are distinguishable from items

FERC has found not to be susceptible of specification such as "weather patterns."

*See, e.g.*, *PJM Interconnection, L.L.C.*, 175 FERC ¶ 61,084, P 66 (2021).

FERC also failed to squarely address whether the Certified Gas Criteria "are

not so generally understood in any contractual arrangement as to render recitation

superfluous."  *City of Cleveland,* 773 F.2d at 1376.  The North American Energy

Standards Board ("NAESB"), a standards-making body, recently published a Certified Gas Addendum to its Base Contract, enabling contracting parties to specify Applicable Certification Authorities and the rating for Certified Gas. NAESB, Renewable Natural Gas (RNG) and Certified Gas (CG) Addendums Update (Feb. 17, 2023), https://naesb.org/pdf4/update022223w3e.docx.  Clearly, Certified Gas Criteria are not superfluous but are essential terms of the transaction.

The Natural Gas Act permitted FERC to pursue two different avenues—either reject the Certified Gas Pooling Service entirely or require Tennessee Gas to incorporate the Certified Gas Criteria into its tariff, subject to the scrutiny of FERC and stakeholders.  Here, FERC allowed Tennessee Gas to define the parameters of the Certified Gas market on its website, ignoring that the Certified Gas Criteria are significant classifications for determining who can use the Certified Gas Pooling Service.  R32, PP 17-19; JA91-92.  The Natural Gas Act does not permit this action, and the Court should vacate FERC's Orders.

**B.     FERC's Orders Attach a Presumption of Validity to the Certified Gas Criteria that Govern Tennessee Gas' Certified Gas Pooling Service**

FERC is a specialized agency with deep technical expertise to address the justness and reasonableness of the rates, terms, and conditions of FERC-regulated transportation service. 15 U.S.C. § 717c(a).  Every action it takes—or fails to take—has meaning to the industry because a "presumption of validity attaches to each

exercise of [FERC's] expertise." *Vill. of Bethany, Ill. v. FERC*, 276 F.3d 934, 940 (7th Cir. 2002) (quoting *N. Ind. Pub. Serv. Co. v. FERC*, 782 F.2d 730, 739 (7th Cir. 1986)). If affirmed, FERC's Orders will attach a presumption of validity to the Certified Gas Criteria that will govern Tennessee Gas' Certified Gas Pooling Service even though FERC never scrutinized whether the criteria reduce methane emissions as purported.

The purpose of Tennessee Gas' Certified Gas Pooling Service is to facilitate the transportation and trading of natural gas purported to be differentiated primarily on the basis of lower methane emissions. December 2021 Tariff Filing at 1, 2; JA174-75. In approving the Certified Gas Pooling Service, FERC gave its imprimatur to Certified Gas transactions on Tennessee Gas' system, without requiring any safeguards to ensure that differentiation is empirically warranted. R1, Exhibit 1; JA5. Tennessee Gas has unilateral discretion to make such determinations and, therefore, impact FERC-regulated service at will. *Id.* Consequently, purchasers and end consumers are vulnerable to unsubstantiated claims that the gas sold is superior from a methane pollution perspective, all under the auspices of a FERC-approved service.

Certified Gas transactions today are governed by private bilateral contracts. AGA Tracker at 3-6 (providing examples of transactions). Stakeholders are seeking regulatory approval for Certified Gas programs, and public resources to support the

8

differentiated gas market. *See, e.g.*, *Proceeding on Motion of the Commission as to the Rates, Charges, Rules and Regulations of Orange and Rockland Utilities, Inc. for Gas Service*, Case 21-G-0073, 2022 N.Y. PUC LEXIS 194 at *131-132 (April 14, 2022) (approving Certified Gas pilot program for Orange and Rockland Utilities). These efforts have engendered concern and opposition given the lack of specific standards to justify market differentiation. *See* Dan Grossman *et al.*, Environmental Defense Fund, *Differentiated Gas: Nothing but Hot Air without These Five Criteria* (May 19, 2022), https://blogs.edf.org/energyexchange/2022/05/19/differentiated-gas-nothing-but-hot-air-without-these-five-criteria/ (explaining that accurately quantifying a company's methane emissions is challenging and that this is a "huge problem for the buyers and customers relying on these representations"); *see also* EDF White Paper at 9-12 (detailing standards needed for credible certification).

While the Department of Energy ("DOE") is "working to identify key elements of a governance framework for [Certified Gas]," it explains "there is not a consensus about what purchaser, regulator, or other stakeholder expectations should be for a company making a claim that delivered or contracted gas is certified relative to its greenhouse gas emissions performance." DOE Draft Framework at 1. FERC's Orders have profound consequences for a nascent market. Without meaningful scrutiny of Tennessee Gas' determinations or a tariff-based framework customers

9

can rely upon, FERC's Orders undoubtedly create confusion in the natural gas market and invite unverifiable if not deceptive claims about the emissions attributes of gas transported on Tennessee Gas' system.

### C.    FERC's Orders Afford Tennessee Gas Undue Discretion in Contravention of the Natural Gas Act

Enforcing the protections enshrined in Section 4 of the Natural Gas Act is a critical part of FERC's statutory responsibility. If tariffs do not include crucial terms affecting FERC-regulated service, pipelines have undue discretion in contravention of the Natural Gas Act's "primary aim" of "protect[ing] consumers against exploitation at the hands of natural gas companies." *FPC v. Hope Nat. Gas Co.*, 320 U.S. at 610.

FERC's Orders are inconsistent with prior precedent where FERC took steps to protect against undue discretion. *See, e.g.*, *Nat. Gas Pipeline Co. of Am.,* 69 FERC ¶ 61,053, p. 61,212 (1994). Here, FERC took a different, impermissible approach by allowing Tennessee Gas to post Certified Gas Criteria on its website and revise those criteria as it sees fit. R32, PP 17-19; JA91-92.

The practical consequence of FERC's decision not to require Tennessee Gas to include the Certified Gas Criteria in its tariff is that Tennessee Gas is now the gatekeeper of the Certified Gas market. No technical or scientific parameters guide which market changes merit a new website posting. Under the FERC-authorized regime, Tennessee Gas decides whether and when to include new third-party

certifiers, whether to change acceptable ratings of each certifier, how to define methane intensity, and whether to tighten or relax methane intensity levels.

This practical consequence does not pose a merely hypothetical concern. The current Certified Gas Criteria posted to Tennessee Gas' website are deeply flawed. The methane emissions intensity level (defined today as "the ratio of methane emissions relative to natural gas throughput") must be less than or equal to 0.2 percent. R1, Exhibit 1; JA5. This has several ramifications for the Certified Gas market. It removes any incentive to improve emissions at more rigorous levels. Comments of EQT Energy, LLC, Docket No. RP22-417-003 at 3 (Apr. 12, 2022); JA333. Without any requirement to ratchet down methane intensity levels over time, there is no guarantee of continued methane reductions as overall intensities decline. EDF White Paper at 12. And the requirement that gas supply *must* have a methane emissions intensity of 0.2% excludes gas certified solely for other environmental, social and governance attributes. FERC's Orders deprive stakeholders any opportunity to be meaningfully heard on the unjustness and unreasonableness that results from these deficiencies.

In a failed attempt to minimize the undue discretion provided to Tennessee Gas, FERC points to states' authority to "define their regulatory goals and determine for themselves what standards gas must satisfy to comport with those goals." R40, P 21; JA163. This rationale presumes that state regulators are developing and

11

applying such standards, which is not always the case.[1]   AGA Tracker at 3 (explaining that New Jersey Natural Gas did not seek regulatory approval before purchasing Certified Gas).  This regulatory gap undermines FERC's reliance on state regulation to avoid its obligations under the Natural Gas Act.

FERC also claims that "[i]f the [Certified Gas] Criteria are out of sync with the interests of market participants, state regulators, or other stakeholders—or if other pipelines implement different, preferable criteria—this will presumably render Tennessee's services less desirable and incentivize Tennessee to revise its criteria." R40, P 21, n.60; JA163.  But the Certified Gas Criteria are *already* out of line with market participants' interests.  Producers have already achieved methane intensity levels lower than the 0.2% percent incorporated on Tennessee Gas' website. Comments of EQT Energy, LLC, Docket No. RP22-417-003 at 3 (Apr. 12, 2022); JA333 (methane emissions intensity of 0.054%).  And gas utilities have committed to rating levels that are more rigorous than those specified by Tennessee Gas. *Proceeding on Motion of the Commission as to the Rates, Charges, Rules and Regulations of Consolidated Edison Company of New York Inc. for Gas Service,*

---

[1]     The only state framework developed to date has been criticized for incorporating certification schemes that rely on questionable data that underestimates emissions.  Dan Grossman, *Energy Security and Climate Change Demand Real Action, Not Shaky Promise of 'Low-emission Gas,'* Virginia Mercury (March 29, 2022), https://www.virginiamercury.com/2022/03/29/energy-security-and-climate-demand-real-action-not-shaky-promise-of-low-emission-gas/.

New York Public Service Commission, Case No. 22-G-0065, Joint Proposal at 94 (February 16, 2023) (if approved, the gas utility would limit purchases to those certified as: (1) Project Canary Trustwell Platinum rating; (2) MiQ Grade A rating; and/or (3) OGMP 2.0, Level 5 rating). As these examples show, Tennessee Gas' Certified Gas Criteria are already lagging behind, demonstrating both FERC's error in presuming Tennessee Gas will revise the Certified Gas Criteria if they are "out of sync" with the broader market, and the harm that results from FERC's abdication of its responsibilities under the Natural Gas Act. By vacating the Orders, the Court can prevent the negative consequences that will result from FERC's unlawful action.

### D.    FERC's Orders Contravene the Natural Gas Act's Consumer-Protection Aim

FERC's primary duty under the Natural Gas Act is to protect consumers. *Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 388 (1959). FERC's failure to adhere to Section 4 of the Natural Gas Act harms the ultimate consumers of Certified Gas—who pay for both the commodity and transportation of gas but now have no assurance whether the "Certified Gas" reduces emissions as purported. FERC emphasizes Tennessee Gas' Certified Gas Pooling Service is "free and voluntary." R32, PP 16-17; JA90-91. But this framing ignores the Orders' impact on the natural gas market more broadly and on FERC-regulated service specifically.

Tennessee Gas stated to FERC that creation of the liquid pools to facilitate the purchase and sale of Certified Gas supply "is expected to greatly enhance the use of

13

[Certified Gas] in the U.S." December 2021 Tariff Filing at 2; JA175. Tennessee Gas catalogued 25 gas producers participating in Certified Gas programs, with total average daily production of 35.7 billion cubic feet per day. *Id.* at Exhibit 1; JA199. Tennessee Gas also stated, and FERC acknowledged, that gas at these new pooling points will trade at a "premium." *Tenn. Gas Pipeline Co., L.L.C.*, 179 FERC ¶ 61,076, P 3 (2022); JA340. This influx of Certified Gas trading—expected to occur at a premium—triggered FERC's obligation to enforce the customer-protection mandates of the Natural Gas Act.

FERC also directed Tennessee Gas to provide a report after 12 months of operation, demonstrating FERC's recognition of the likelihood that its Orders will have significant market implications. R32, P 23; JA94 (directing that the report "describe the level of utilization of the [Certified Gas] pools vis-à-vis the non-[Certified Gas] pools, pool prices, development of trading/certificate tracking platforms at the pools, and [Certified Gas] volumes by third-party certification provider."). The fact that Tennessee Gas must detail market impacts such as "pool prices" demonstrates the lack of a rational basis for FERC's conclusion that it need not look beyond the "informational feature" of the Certified Gas Pooling Service. R40, P 18; JA160-61.

FERC also acknowledged the connection between the Certified Gas Criteria and the price premium, finding that if Certified Gas commands a price premium, "it

presumably does so principally based on the attributes that differentiate it from other gas, such as the quality of the certifications it receives, its methane emissions intensity, and other factors relating to its production and gathering." R40, P 29, n. 83; JA168-69. But when pressed to fulfill its primary obligation to protect consumers, FERC claimed it lacked jurisdiction over production, gathering, or the price charged, including premiums. R40, P 30; JA169.

While FERC does not have jurisdiction over production, gathering, or commodity prices, its overly narrow conclusion ignores that a significant influx of Certified Gas that trades in the commodity market will necessarily impact FERC-regulated transportation services. *Regulation of Short-Term Natural Gas Transportation Services, and Regulation of Interstate Natural Gas Transportation Services,* Order No. 637, FERC Stats. & Regs ¶ 31,091, p. 31,258 (2000) (explaining the interrelationship between commodity and transportation markets, with changes in one market impacting the other). Further, the premium for Certified Gas will affect price signals in contravention of the Natural Gas Act's goals of encouraging "the orderly development of plentiful supplies of . . . natural gas at reasonable prices." *NAACP v. FPC*, 425 U.S. 662, 670 (1976). This fact should have compelled FERC to satisfy its core statutory responsibility to ensure just and reasonable rates. FERC erred in abdicating that responsibility.

15

Gas utilities on Tennessee Gas' system have identified Certified Gas programs as part of their future plans to serve end-use customers. *See, e.g.*, Berkshire Gas Company, Net Zero Enablement Plan, Massachusetts D.P.U. 20-80 at 13 (March 18, 2022) ("Berkshire proposes to start a pilot program that will allow it to seek out and contract for differentiated gas."). If affirmed, the practical effect of FERC's Orders will be that consumers will pay transportation rates that are affected by the Certified Gas Criteria without any assurance that those criteria reduce greenhouse gas emissions as advertised. The Court should vacate the Orders because they violate Section 4 of Natural Gas Act and FERC's statutory obligation to protect consumers.

## CONCLUSION

**Wherefore**, the Court should vacate the challenged Orders and remand for further consideration.

16

Respectfully submitted,

Dan Grossman
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO  80302
(303) 447-7213
dgrossman@edf.org

*/s/ Natalie M. Karas*
Natalie M. Karas
Jason T. Gray
Duncan & Allen LLP
1730 Rhode Island Avenue, NW
Suite 700
Washington, DC  20036
(202) 289-8400
nmk@duncanallen.com
jtg@duncanallen.com

Ted Kelly
Environmental Defense Fund
1875 Connecticut Ave, NW
Washington, DC  20009
(202) 572-3389
teklley@edf.org

*Attorneys for the Environmental Defense Fund*

Final Dated: August 14, 2023

## CERTIFICATE OF COMPLIANCE

Per Fed. R. App. P. 29(a)(4)(G), Fed. R. App. P. 29(a)(5), and the Court's February 22, 2023 order, I certify that this amicus brief complies with the type-volume limitations because its textual portions, including headings, footnotes, and quotations contain 3,507 words, as counted by the "Word Count" feature of Microsoft Word 2010, the program with which this brief was prepared.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Final Dated: August 14, 2023

Respectfully submitted,

*/s/ Natalie M. Karas*
Natalie M. Karas
Duncan & Allen LLP
1730 Rhode Island Avenue, NW
Suite 700
Washington, DC  20036
(202) 289-8400
nmk@duncanallen.com

## **CERTIFICATE OF SERVICE**

Pursuant to Circuit Rule 25(c), I hereby certify that I have this 14th day of August 2023, filed the foregoing Amicus Brief of the Environmental Defense Fund with the Court using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Final Dated: August 14, 2023

Respectfully submitted,

*/s/ Natalie M. Karas*
Natalie M. Karas
Duncan & Allen LLP
1730 Rhode Island Avenue, NW
Suite 700
Washington, DC  20036
(202) 289-8400
nmk@duncanallen.com

Addendum A

**Discussion Draft – March 9, 2023**                              **Office of Resource Sustainability**

# Draft Framework for Differentiated Natural Gas: Criteria, Transparency, and Governance

The U.S. Department of Energy (DOE) Office of Fossil Energy and Carbon Management (FECM) hosted a technical workshop in October 2022 entitled "Natural Gas for a Sustainable Future." The workshop included three sessions: measurement and best practices, technology development, and international engagements and exports. The workshop reinforced that there is considerable activity underway related to the measurement, reporting, and verification of greenhouse gas emissions associated with natural gas. This activity includes but is not limited to the U.S. Environmental Protection Agency's (EPA) Greenhouse Gas Reporting Program (GHGRP), the Oil and Gas Methane Partnership 2.0 (OGMP 2.0), proposed European Commission methane regulations, GTI Energy's Methane Emissions Measurement and Verification Initiative (Veritas), and the draft North American Energy Standards Board (NAESB) Certified Natural Gas Addendum. In addition to these initiatives, independent organizations and companies have advanced protocols to certify natural gas and a wide range of stakeholders have participated in methane emission measurement campaigns and reconciliation studies.

While certification programs, measurement approaches, and reporting protocols are advancing, a theme that emerged from the workshop is that there is not a consensus about what purchaser, regulator, or other stakeholder expectations should be for a company making a claim that delivered or contracted gas is certified relative to its greenhouse gas emissions performance. FECM heard from stakeholders that there is a need for better harmonization of monitoring, reporting, and verification across current programs.

Building on the success of the technical workshop, in consultation with other agencies including the U.S. State Department and EPA, FECM is working to identify key elements of a governance framework for differentiated natural gas (also referred to as certified or responsibly-sourced natural gas). The goal of this work is to harmonize approaches to provide fuel purchasers, including LNG importers, greater clarity on the emissions content of delivered fossil fuels, and ultimately to enable deeper reductions in greenhouse gas emissions. While DOE is not proposing or committing to a specific approach at this time, this discussion paper is intended to outline key elements of a potential governance framework for differentiated natural gas. The initial focus is on life cycle greenhouse gas emissions resulting from the production through delivery of natural gas, including associated gas produced with heavier hydrocarbons, but could be expanded to other fossil fuels and attributes over time.

## Potential Elements of a Differentiated Natural Gas Governance Framework

Figure 1 provides a conceptual diagram of a potential differentiated natural gas governance framework in relation to other elements of the natural gas marketplace and regulatory system. As outlined, the governance framework would address three elements: common criteria for certification of natural gas, a process for accrediting and providing independent oversight of certification programs, and expectations for data reporting and transparency.

### Natural Gas Certification Criteria

Establishing common criteria for natural gas certification is a critical element of a potential differentiated natural gas governance framework. Examples of common criteria include technical criteria for the quantification and reporting of greenhouse gas emissions, expectations for emission mitigation best practices, and a process for independent verification of emission estimates and adherence to these criteria. Identified criteria would initially focus on greenhouse gases but the governance framework could incorporate a mechanism for adding non-greenhouse gas criteria over time.



## Accreditation Process

Another critical aspect of a potential differentiated natural gas governance framework is to establish and oversee an accreditation process through which certification programs, whether developed by third parties or by individual companies, are confirmed as meeting the established certification criteria. The intent of the accreditation process would be to increase confidence that claims about the greenhouse gas profile of delivered fossil fuels are comparable across different certification programs. The accreditation process would confirm that the certification programs include protocols that are consistent with the common criteria and include a mechanism for independent oversight.

## Data Transparency

A differentiated natural gas governance framework could advance approaches to collecting and reporting data consistent with the needs of natural gas market participants (see Figure 1 below) and other stakeholders (e.g., local communities, environmental organizations, etc.). This could include identifying current gaps in data coverage and fidelity, improving the granularity and accuracy of data over time, establishing an approach to incorporate data into life cycle tools, and establishing a platform for making data available to the public.

**Figure 1. Conceptual Diagram of a Differentiated Natural Gas Governance Framework**



## Opportunities for Feedback

FECM welcomes feedback on elements described in this discussion paper. Please direct comments or questions to Tom Curry (thomas.curry@hq.doe.gov) and Suzie Waltzer (suzanne.waltzer@hq.doe.gov) in FECM's Office of Resource Sustainability.

